## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| ROBERT WIGINGTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| METROPOLITAN NASHVILLE | ) | |
| AIRPORT AUTHORITY, | ) | |
| BOBBY JOSLIN, and | ) | |
| A. DEXTER SAMUELS, | ) | |
| | ) | |
| Defendant. | ) | |
| ——————————————— | ) | 3:17 C 1523 |
| | ) | Hon. Marvin E. Aspen |
| METROPOLITAN NASHVILLE | ) | |
| AIRPORT AUTHORITY, | ) | |
| | ) | |
| Counter Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ROBERT WIGINGTON, | ) | |
| | ) | |
| Counter Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

MARVIN E. ASPEN, District Judge:

Plaintiff Robert Wigington filed this suit against Defendant Metropolitan Nashville Airport Authority ("MNAA") on December 4, 2017, asserting federal and state claims arising out of his termination as MNAA's chief executive officer ("CEO"). (Compl. (Dkt. No. 1).) Wigington amended his complaint on January 17, 2018 to add as defendants MNAA Board members Bobby Joslin and A. Dexter Samuels (together "Individual Defendants"). (Dkt. No. 13.) MNAA answered Wigington's initial complaint and counterclaimed against him on February 1, 2018, alleging breach of fiduciary duty. (Dkt. No. 17.) Following additional

amendments, the pleadings now operative are Wigington's second amended complaint (Second Am. Compl. ("SAC") (Dkt. No. 34)), and MNAA's renewed answer and counterclaim, (Answer to Pl.'s Second Am. Compl. and Am. Countercl. ("Am. Countercl.") (Dkt. No. 36)).

Before us are two motions: Individual Defendants' motion to dismiss Wigington's claims as to them, (Dkt. No. 37), and Wigington's motion to dismiss MNAA's amended counterclaim, (Dkt. No. 39). For the reasons below, we deny the Individual Defendants' motion, and grant Wigington's motion.

## BACKGROUND

The factual allegations that follow, all taken as true for purposes of a motion to dismiss, are drawn from Wigington's second amended complaint and MNAA's corresponding counterclaim. (SAC; Am. Countercl.) *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009). MNAA is a public corporation that owns and operates two Nashville-area airports, the Nashville International Airport ("BNA") and John C. Tune Airport ("JWN"). (*See* SAC ¶ 26; Am. Countercl. ¶ 2; Dkt. No. 34–1 at 2 (Wigington employment agreement identifying MNAA as a corporation created pursuant to Tenn. Code Ann. § 42-4-101, *et seq.*).) MNAA policies are shaped by a ten-member Board of Commissioners ("Board"), appointed by the mayor of Nashville-Davidson County. (SAC ¶ 20.) The Board's Management Committee is comprised of the Chair, Vice Chair, and Secretary of the full Board. (*Id.*) As of the filing of the second amended complaint, Defendant Joslin served as the Board's Chair and Defendant Samuels served as Vice Chair. (*Id.* ¶ 22.)

Wigington began his work with MNAA in 2011 and served as CEO from July 1, 2012 through October 18, 2017. (*Id.* ¶ 2.) On June 7, 2017, Wigington informed the MNAA Management Committee at a publicly noticed meeting that he would require a medical leave of

absence to undergo a liver transplant to treat liver cancer.  (*Id.* ¶¶ 4, 33–35.)  Wigington informed the full Board of his anticipated leave on June 21, 2017.  (*Id.* ¶ 41.)

Wigington's medical leave began on July 22, 2017, when he underwent a liver transplant and named an acting President and CEO to serve in the interim, and it extended through September 5, 2017, when he attempted to return to his position.  (*Id.* ¶¶ 5, 54–56.)  On August 18, 2017, Wigington had written to inform MNAA that a doctor had approved his return to work on September 4, 2017.  (*Id.* ¶ 68.)  On September 1, 2017, Samuels invited Wigington to a meeting of the Management Committee on September 5, 2017.  (*Id.* ¶ 76.)  At this meeting, the Management Committee told Wigington that MNAA had decided to go in a different direction and would be relieving Wigington of his duties.  (*Id.* ¶¶ 77–78.)  Wigington alleges that this meeting was not publicly noticed.  (*Id.* ¶ 83.)  Joslin sent Wigington a letter on September 6, 2017, explaining that Wigington was no longer authorized to act on behalf of MNAA and that his security badge, computer, and email address were deactivated.  (*Id.* ¶ 84.)

On October 18, 2017, the MNAA Management Committee (comprised of the Individual Defendants and Secretary Aubrey "Trey" Harwell) voted to recommend that the Board terminate Wigington's employment as CEO.  (*Id.* ¶ 91.)  Upon their recommendation, the Board voted to terminate that same day.  (*Id.* 92.)  The Management Committee distributed to Board members and the media a list of "reported behaviors" they attributed to Wigington to support his termination.  (*Id.* ¶ 92.)  Among the allegations were that Wigington failed to disclose the content or amount of incentives provided to an airline to fly out of Nashville, that he was dilatory in appointing key staff positions during a large capital effort and improperly planned for the succession of those staff once they were named, and that he lacked proper financial controls, failed to address major employment and management issues, and failed to properly communicate or deliberately concealed information from the MNAA Board.

(*Id.* ¶¶ 112, 134, 156, 171, 193, 209.)  Wigington alleges that each of these reported behaviors are false, did not motivate MNAA's termination decision, and could not justify that decision. (*E.g.*, *id.* ¶ 110.)

On December 6, 2017, the Individual Defendants, acting as the Management Committee, voted to recommend to the Board that Wigington's termination be reclassified as "for cause." (*Id.* ¶¶ 103–04.)  The Individual Defendants and another member of the Management Committee described new allegations against Wigington, along with the previously released "reported behaviors," at this meeting and again at a Board meeting on December 13, 2017.  (*Id.* ¶ 105.) The new allegations asserted that Wigington did not properly invest $200 million from a 2015 bond issue and that he exceeded reimbursements on business travel expenses.  (*Id.* ¶¶ 234, 237.) The Board took up the Management Committee's recommendation and voted to label Wigington's termination as "for cause" at the meeting on December 13, 2017.  (*Id.* ¶ 105.) Wigington maintains that the new allegations did not and could not justify his termination "for cause," and served instead only as pretext for a decision that he alleges is retaliatory and meant to harm his reputation.  (*Id.* ¶ 244.)

As relevant here, Wigington asserts claims of defamation and false light invasion of privacy against the Individual Defendants, in their individual capacity, stemming from their statements and actions during the Management Committee and Board meetings on October 18, 2017, the Management Committee meeting on December 6, 2017, and the Board meeting on December 13, 2017.  (*See id.* ¶¶ 330–35, 339–45.)[1]

---

[1] The current motions do not challenge Wigington's claims against MNAA, which allege federal and state discrimination and retaliation claims and state contract claims. (*See* SAC ¶¶ 262–64, 268, 280–83, 292–94, 300–03, 313, 321–26.)

MNAA's counterclaims charge Wigington with breach of his fiduciary duty to MNAA. (*See* Am. Countercl. ¶¶ 31, 37.) MNAA alleges that in December 2015, Wigington should have placed proceeds from an approximately $200 million MNAA bond issue into interest-bearing investments instead of leaving the decision to a subordinate who kept the money, plus a substantial amount of previously accumulated money, in cash or cash equivalents. (*Id.* ¶¶ 12–19.) Despite specific advice from MNAA's Chief Financial Officer ("CFO"), Wigington refused to make a decision to hire consultants or persons with expertise to manage MNAA's assets. (*Id.* ¶¶ 22–24.) Wigington did not act when investment advisors tendered proposals to MNAA in December 2015 and December 2016 to invest the money, costing MNAA at least $3 million total in lost interest income. (*Id.* ¶¶ 40–43.) The CFO also told Wigington of a time-sensitive opportunity in fall 2016 to refinance debt incurred from designing and building a rental car facility, which Wigington decided not to act upon, costing MNAA approximately $4.8 million. (*Id.* ¶¶ 25–29.) Through these events, MNAA claims Wigington breached his fiduciary duty by failing to discharge his duties in good faith and with ordinary care, failing to inform himself of important decisions or to rely upon information provided to him by officers or employees of MNAA, and failing to fully disclose the facts of his decisions or non-decisions to the Board. (*Id.* ¶¶ 33–34, 46.)

## LEGAL STANDARD

Dismissal pursuant to Rule 12(b)(6) is proper only if a complaint lacks enough facts "to state a claim [for] relief that is plausible on its face." *Iqbal*, 556 U.S. at 678, 129 S. Ct. at 1949–50 (2009) (internal quotations omitted) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007)); *accord Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009). The plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted

unlawfully." *Iqbal*, 556 U.S. at 678, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1964–65). That is, while the plaintiff need not plead "detailed factual allegations," the complaint must allege facts sufficient "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1964–65. Again, we accept as true all well-pleaded factual allegations and draw all reasonable inferences in favor of the plaintiff. *Iqbal*, 556 U.S. at 678, 129 S. Ct. at 1949; *Delay v. Rosenthal Collins Grp., LLC*, 585 F.3d 1003, 1005 (6th Cir. 2009). "However, 'a legal conclusion couched as a factual allegation' need not be accepted as true on a motion to dismiss, nor are recitations of the elements of a cause of action sufficient." *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010) (quoting *Hensley Mfg.*, 579 F.3d at 609).

## ANALYSIS

## I.    INDIVIDUAL DEFENDANTS' MOTION TO DISMISS

Individual Defendants Joslin and Samuels' motion to dismiss argues that, as members of MNAA's Board acting in their official capacity, they are entitled to absolute immunity under Tennessee statutory and common law. (Dkt. No. 37 at 1–2.) Furthermore, Individual Defendants argue that Wigington has not sufficiently pleaded ill motive necessary to state a claim for defamation or false light invasion of privacy. (*Id.* at 2.) We consider each argument in turn.

### A.    Applicable Immunity

Individual Defendants ground their immunity argument in the Tennessee Governmental Tort Liability Act ("GTLA"), Tenn. Code Ann. § 29-20-101, *et seq.*, and Tennessee courts' adoption of legislative immunity. (*See* Joslin and Samuels' Mem. in Supp. of Mot. to Dismiss ("I.D. Mem.") (Dkt. No. 38) 6–7.) The GTLA provides "[c]omplete and absolute immunity" to

"government entity boards, commissions, authorities and other governing agencies."  Tenn. Code

Ann. § 29-20-201(b)(1).  The GLTA further provides:

> (2) *All members of boards*, commissions, agencies, authorities, and other governing
> bodies *of any governmental entity*, created by public or private act, whether compensated
> or not, *shall be immune from suit arising from the conduct of the affairs of such board*,
> commission, agency, authority, or other governing body. *Such immunity from suit shall
> be removed when such conduct amounts to willful, wanton, or gross negligence.*

*Id.* § 29-20-201(b)(2) (emphasis added).

Individual Defendants claim that the GTLA, as interpreted by Tennessee courts, bestows

absolute immunity from suit to members of boards acting within the scope of their government

role.  (I.D. Mem at 6–7 & n.4.)  Individual Defendants heavily rely on *Miller v. Wyatt*,

457 S.W.3d 405 (Tenn. Ct. App. 2014), to support their argument.  (I.D. Mem. at 9–14.)  In

*Miller*, the Tennessee Court of Appeals considered whether a city council member was entitled

to immunity from a defamation suit.  The court analyzed the constitutional history of absolute

legislative immunity and found that the GTLA "adopted and codified the common law

legislative privilege for city council members and other legislators at the local level."  *Id.* at 410.

The court held that the suit, which alleged the city council member made defamatory statements

while performing his legislative duties at a council meeting, was barred by legislative privilege.

*Id.* at 412.  Having applied the privilege, the court declined to inquire further into the council

member's motivation behind the alleged defamation.  *Id.*

Following *Miller*, Individual Defendants claim they are likewise entitled to absolute

immunity under the GTLA, shielding them from suit even if alleged to have acted with actual

malice.  (I.D. Mem. at 14.)  Individual Defendants argue that the GTLA applies not only to

legislators, but to any member of a governmental entity board. (*Id.* at 13.)[2]  Because the claims

against Individual Defendants all concern statements they allegedly made during official

Management Committee and MNAA Board meetings about Wigington's performance as CEO,

they argue their statements fall squarely within the course of their duties, preserving their

immunity. (*Id.* at 12–13.)  Although the GTLA removes immunity "when such conduct amounts

to willful, wanton, or gross negligence," Tenn. Code Ann. § 29-20-201(b)(2), Individual

Defendants reason that this statutory text refers only to "private slanders" that either occur

outside of or deviate substantially from their official duties. (I.D. Mem. at 11 (quoting *Miller*,

457 S.W.3d at 410); *see also* I.D. Reply at 5.)

Wigington agrees the GTLA governs in this case but disputes Individual Defendants'

claim to absolute immunity under its provisions. (*See* Pl.'s Opp. to Defs. Joslin and Samuels'

Mot. to Dismiss ("Wigington Resp.") (Dkt. No. 42) at 2.)  Wigington argues that while the

GTLA grants absolute immunity to government boards themselves, it confers only qualified

immunity on other public officials. (*Id.* at 6–7.)  These officials, he argues, are immune from tort

suits in all cases except those in which the officials act in a willful, wanton, or grossly negligent

manner. (*Id.* at 4–5.)  *See* Tenn. Code Ann. § 29-20-201(b)(2).  Wigington disagrees with

Individual Defendants' reading of *Miller*, arguing that the case rested on common law legislative

immunity, and not on the text of the GTLA. (Wigington Resp. at 8.)  Wigington further denies

---

[2] Individual Defendants argue in their opening brief that, to the extent GTLA immunity applies
only to legislative activity, their investigation into Wigington's conduct suffices to shield them
from suit. (I.D. Mem. at 13 (citing *Tenney v. Brandhove*, 341 U.S. 367, 369 (1951), for the
proposition that investigations are part of the legislative function).)  Individual Defendants
appear to abandon this position in their reply. (*See* Joslin and Samuels' Reply ("I.D. Reply")
(Dkt. No 46) at 5 n.3 (disclaiming need to analyze legislative versus non-legislative function and
arguing that the GTLA text itself incorporates absolute immunity for all work done within the
scope of the government function).)  *See Smith v. ABN AMRO Mortg. Grp. Inc.*,
434 F. App'x 454, 466 (6th Cir. 2011) (considering an argument raised in opening brief
abandoned when discarded at oral argument and in reply brief).

that Individual Defendants, who are municipal executive appointees, could be characterized as legislators who qualify for common law legislative immunity. (*Id.* at 9.)

As an initial matter, we are skeptical that *Miller v. Wyatt* transforms the text of the GTLA into absolute immunity for any member of a government board, whether or not acting as a legislator. To be sure, the concept of legislative immunity enjoys a long pedigree and a wide berth under United States Supreme Court precedent. *E.g.*, *Bogan v. Scott-Harris*, 523 U.S. 44, 54, 118 S. Ct. 966, 972 (1998) (immunity for local legislators from suits under 42 U.S.C. § 1983); *Tenney v. Brandhove*, 341 U.S. 367, 375, 71 S. Ct. 783, 788 (1951) (immunity for state legislators); *Kilbourn v. Thompson*, 103 U.S. 168, 202–04 (1880) (immunity for Members of Congress under the Speech and Debate Clause, U.S. Const., art. I, § 6). *Miller* recounts much of this case history, as well as Tennessee precedent extending the privilege to city council members. 457 S.W.3d at 409 (citing and discussing *Issa v. Benson*, 420 S.W.3d 23 (Tenn. Ct. App. 2013), and *Cornett v. Fetzer*, 604 S.W.2d 62 (Tenn. Ct. App. 1980)). But *Miller*'s ultimate holding appears to ground the city council member's immunity in common law legislative privilege, not in the text of the GTLA. *Id.* at 412 (holding that local legislator's conduct arose during a city council meeting, fell into the scope of legislative function, and "therefore was cloaked with immunity"). Although *Miller* asserts that the GTLA "codified the common law legislative privilege," the rest of that sentence limits that codification to "*city council members and other legislators at the local level*," saying nothing about its effect on non-legislators. *Id.* at 410 (emphasis added). Tellingly, the only Tennessee case *Miller* cites in its holding does not mention the GTLA. *Id.* at 412 (citing *Issa*, 420 S.W.3d at 28). And while *Miller* delineates legislative privilege as not extending to "private slanders," the case analyzes this limit under the common law of legislative immunity, not the text of the GTLA that removes immunity for willful, wanton, or grossly negligent conduct. *Id.* at 410 (discussing Tennessee and

U.S. Supreme Court cases that rest on common law or constitutionally conferred legislative immunity). "Just as a square is always a rectangle but a rectangle is not always a square," *United States v. Fitzgerald*, 906 F.3d 437, 452 (6th Cir. 2018) (Griffin, J., dissenting), *Miller* finds that absolute legislative immunity is incorporated into the GTLA, but it is far less clear that the GTLA extends absolute immunity to non-legislators. As a federal court interpreting Tennessee law, we decline to extend the immunity conferred by the GTLA beyond the Tennessee Appellate Court's narrow holding in *Miller*.

The conclusion that the GTLA does not grant absolute immunity to non-legislators draws support from the text of the GTLA and from Tennessee case law pre- and postdating *Miller*. The GTLA plainly states that "members" of governmental boards are immune from suit, but that "[s]uch immunity from suit shall be removed when such conduct amounts to willful, wanton, or gross negligence." Tenn. Code App. § 29-20-201(b)(2). Put another way, "the plain language of this statute provides that immunity will not extend to the 'members' of governmental entities who act in willful, wanton, or grossly negligent manners." *Fitzgerald v. Hickman Cty. Gov't*, No. M2017–00565–COA–R3–CV, 2018 WL 1634111, at *5 (Tenn. Ct. App. Apr. 4, 2018). The *Fitzgerald* court based its reading in part on earlier case law that "previously held that '[l]ocal government officials are not immune from suit for willful or wanton acts or acts amounting to gross negligence.'" *Id.* (quoting *Moore Const. Co. v. Story Eng'g Co.*, No. 01A01–9606–CV–00267, 1998 WL 382198, at *4 (Tenn. Ct. App. July 10, 1998)). The Tennessee Supreme Court has also observed that "members" of government boards can face liability when their conduct crosses the statutory line. *Jenkins v. Loudon Cty.*, 736 S.W.2d 603, 608 n.7 (Tenn. 1987), *abrogated on other grounds by Limbaugh v. Coffee Med. Ctr.*, 59 S.W.3d 73 (Tenn. 2001) (under Tenn. Code Ann. § 29-20-201(b), "members of certain boards, etc., are not immune if their 'conduct amounts to willful, wanton, or gross negligence.'")

Individual Defendants argue that this plain text removes immunity only for private slanders, not for actions by government officials within "the conduct of the affairs" of a government board. (I.D. Reply at 2 (quoting Tenn. Code App. § 29-20-201(b)(2)).) But this argument is not supported by the case law, which has applied the "private slanders" carveout only to local *legislators* acting in an official capacity. *See Miller*, 457 S.W.3d at 410 (quoting *Issa*, 420 S.W.3d at 27). Individual Defendants do not characterize themselves as legislators or their activity as legislative, arguing "[i]t would be nonsensical to apply different types of immunity to different government actors when that immunity is based on the exact same statutory language" in the GTLA. (I.D. Reply at 5 n.3.) We agree. As *Miller* appears to hold, while common law legislative privilege might be incorporated in and extend beyond the GTLA text, the text itself does not extend to non-legislators.

Individual Defendants have produced no case that grants absolute immunity to defendants in their position—executive appointees to a municipal board. The closest they come is *Jones v. State*, 426 S.W.3d 50, 56–58 (Tenn. 2013), which extended common law absolute immunity to cabinet-level executive officers acting pursuant to their public duties. (I.D. Mem. at 8.) Individual Defendants do not claim that they qualify as this type of high-ranking official. The Tennessee Appellate Court's more recent exposition, in *Fitzgerald v. Hickman County Government*, of the GTLA's removal of immunity for willful actions makes no distinction between private and public offenses, nor does the text of the GTLA. *See Fitzgerald*, 2018 WL 1634111, at *5. We refuse to read this distinction into the statute.[3]

---

[3] Individual Defendants challenge *Fitzgerald* as holding that a plaintiff could not sue board members in their official capacity as a back-door way to sue an immune county. (I.D. Reply at 4 n.2.) But *Fitzgerald*'s discussion reveals only that individuals sued in their official capacities are immune if the government entity they represent is also immune. *Fitzgerald*, 2018 WL 1634111, at *5. Plaintiff here has sued Individual Defendants in their *individual* capacities. (SAC ¶¶ 329, 338.) *See Kentucky v. Graham*, 473 U.S. 159, 165–67,

Accordingly, we hold that in this case, Individual Defendants are not entitled to immunity under the GTLA in the course of their MNAA duties if their conduct was willful, wanton, or amounted to gross negligence. Tenn. Code App. § 29-20-201(b)(2). For purposes of this motion to dismiss, we next consider whether Plaintiff has sufficiently pleaded such conduct to state claims against Individual Defendants.

## B. Sufficiency of Pleadings

Individual Defendants assert that Wigington has not sufficiently pleaded that they acted with the mental states necessary to remove their immunity under the GTLA and to state claims for defamation and false light invasion of privacy. (I.D. Mem. at 15.) Individual Defendants point to allegations in Wigington's complaint that merely restate the requisite legal standard that they acted "willfully, wantonly, and with actual malice." (*Id.* at 16 (quoting SAC ¶¶ 335, 345).) Of course, we need not "accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678.

As discussed above, Wigington must plead that Individual Defendants acted willfully, wantonly, or with gross negligence to remove their immunity under the GTLA.[4] *See* Tenn. Code Ann. § 29-20-201(b)(2). Wigington argues that Tennessee courts have not clearly defined the showing required for the enumerated mental states. (Wigington Resp. at 14.) *See, e.g.*, *Stratienko, M.D. v. Chattanooga-Hamilton Cty. Hosp. Auth.*, No. 1:07-CV-258,

---

105 S. Ct. 3099, 3105–06 (1985) (explaining distinction between suits in official versus individual capacities). Indeed, *Fitzgerald* goes on to allow suit against a mayor in his individual capacity under a similar provision of the GTLA, Tenn. Code App. § 29-20-310(c), for torts allegedly committed while the mayor presided over a city council meeting. *Fitzgerald*, 2018 WL 1634111, at *7, *13.

[4] Even if Wigington sufficiently alleges that Individual Defendants acted in such a way as to remove immunity at the motion to dismiss stage, Individual Defendants may still be entitled to immunity under the GTLA if the facts as developed through discovery show that their conduct does not reach the threshold to remove it.

2008 WL 4191275, at *7 (E.D. Tenn. Sept. 8, 2008) ("The Court has found no Tennessee case law clearly defining malice, in the context of the Tennessee Governmental Tort Liability Act . . . ."). But related case law is instructive. *See, e.g.*, *Ingram v. Tenn. Dep't of Labor & Workforce Dev.*, No. 3:12-CV-01106, 2013 WL 1965130, at *4 (M.D. Tenn. May 10, 2013) (roughly translating "willful" and "malicious" as "a deliberate desire to wrong [the plaintiff]" (quoting *Purisch v. Tenn. Tech. Univ.*, 76 F.3d 1414, 1421 (6th Cir. 1996))); *Autry v. Hooker*, 304 S.W.3d 356, 364 (Tenn. Ct. App. 2009) ("'Gross negligence' is 'conscious neglect of duty or a callous indifference to consequences.'" (quoting *Conroy v. City of Dickson*, 49 S.W.3d 868, 871 (Tenn. Ct. App. 2001))).

In addition, a public official stating a claim for defamation must plead that Individual Defendants acted with "actual malice,"[5] defined as "knowledge that [the defamatory statement] was false or with reckless disregard of whether it was false or not." *Hibdon v. Grabowski*, 195 S.W.3d 48, 58 (Tenn. Ct. App. 2005) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80, 84 S. Ct. 710, 726 (1964)); *see also West v. Media Gen. Operations, Inc.*, 120 F. App'x 601, 618 (6th Cir. 2005). The same "actual malice" standard applies to a false light claim from a public official. *Lewis v. NewsChannel 5 Network, L.P.*, 238 S.W.3d 270, 303 (Tenn. Ct. App. 2007).

Taking these standards together, Wigington's complaint would be sufficient if it alleges that Individual Defendants made public statements that they knew were false or that deliberately put Wigington's reputation in a false light while knowing or recklessly disregarding their falsehood. *See Autry*, 304 S.W.3d at 364; *Hibdon*, 195 S.W.3d at 58; *Lewis*, 238 S.W.3d at 303. Wigington alleges that Individual Defendants presented a list of "reported behaviors" to the

---

[5] For purposes of this motion to dismiss, we assume, without deciding, that Wigington is a public official subject to the heightened pleading standards for defamation and false light invasion of privacy.

MNAA Board and the press, first to justify his termination, and then, along with additional allegations, to justify his firing "for cause." (SAC ¶¶ 330–34, 339–43.) Wigington further alleges that the "reported behaviors" were false, and that Individual Defendants knew they were false. For example, one of the "reported behaviors" was that Wigington failed to disclose the content of negotiations or the amount of incentives provided to British Airways to establish a direct route to London. (SAC ¶ 112.) Wigington alleges that, on the contrary, he did disclose the negotiations and incentives, and that Individual Defendants were kept continuously informed of both. (*See id.* ¶¶ 116–19, 125–27.) Wigington alleges that the allegation publicized by Individual Defendants "has no basis in fact." (*Id.*¶¶ 131–32.) For another example, when the Board decided to classify Wigington's termination "for cause," Wigington alleges that the Management Committee claimed Wigington "exceeded reimbursements permitted by policy" on his business travel expenses. (*Id.* ¶ 237.) Wigington alleges he in fact followed MNAA's travel policy and chose only the most cost-effective mode of travel and lodging, and that the Management Committee had never raised business expense issues during any previous discussions or Board meetings or during Wigington's initial termination. (*Id.* ¶¶ 240–43.) Wigington claims that this allegation publicized by Individual Defendants "has no basis in fact" and was "merely pretext" to reclassify his termination as "for cause." (*Id.* ¶ 244.) Taking these allegations as true, as we must on a motion to dismiss, Wigington alleges sufficient factual material to support the plausibility that Individual Defendants acted willfully, wantonly, or grossly negligently, and with actual malice.

For the foregoing reasons, Individual Defendants' motion to dismiss is denied.

## II.    WIGINGTON'S MOTION TO DISMISS COUNTERCLAIMS

Wigington moves to dismiss MNAA's amended counterclaims. (Dkt. No. 39.) He advances several grounds for dismissal, including that the statute of limitations bars MNAA's

claims, that MNAA fails to make out a prima facie case of breach of fiduciary duty, and that his

decision as to the refinancing of debt from the car rental facility is protected by the business

judgment rule. (Counter-Def.'s Mem. in Supp. of Mot. to Dismiss Counterclaims

("Wigington Mem.") (Dkt. No. 40) 5–15.) Wigington also asserts that MNAA's counterclaims

should be dismissed because they constitute unlawful retaliation. (*Id.* at 2–5.) Because we find

that MNAA's counterclaims as pleaded are barred by the applicable statute of limitations, we

address only those arguments in the following analysis.

Wigington argues that MNAA's counterclaims are barred by the one-year statute of

limitations for breach of fiduciary duty actions under Tennessee law. (Wigington Mem. at 5.)

Tennessee Code Annotated § 48-18-601 defines the applicable statute of limitations in this case

and states, in relevant part:

> Any action alleging breach of fiduciary duties by directors or officers . . . must be
> brought within one (1) year from the date of such breach or violation; provided, that in
> the event the alleged breach or violation is not discovered nor reasonably should have
> been discovered within the one-year period, the period of limitation shall be one (1) year
> from the date such was discovered or reasonably should have been discovered. In no
> event shall any such action be brought more than three (3) years after the date on which
> the breach or violation occurred, [except for claims of fraudulent concealment, not
> alleged here] . . . .

Tenn. Code Ann. § 48-18-601. MNAA does not dispute that this statute governs the limitations

period for its counterclaims. (*See* MNAA's Resp. to Wigington's Mot. to Dismiss Countercl.

("MNAA Resp.") (Dkt. No. 43) 16.) "[W]hile a defendant ordinarily has the burden to establish

its statute of limitations defense, when the court can ascertain from the complaint that the period

for bringing the claim has expired, a plaintiff must affirmatively plead an exception to the

limitations statute." *Reid v. Baker*, 499 F. App'x 520, 526 (6th Cir. 2012). The Tennessee

statute codifies the discovery rule, "an equitable exception that tolls the running of the statute of

limitations." *Id.* at 525 (quoting *Pero's Steak & Spaghetti House v. Lee*, 90 S.W.3d 614, 621

(Tenn. 2002)). However, to get the benefit of the discovery rule, a plaintiff must plead either that the alleged breach of duty was discovered within the one-year statute of limitations or that the wrongdoing could not reasonably have been discovered within the limitations period. (*Id.* at 526.) Since MNAA filed its counterclaims on February 1, 2018, (Dkt. No. 17), MNAA must plead that Wigington's breaches occurred on or after February 1, 2017, or that MNAA did not discover nor could have reasonably discovered Wigington's breaches until after February 1, 2017. *Reid*, 499 F. App'x at 526.

Wigington argues that the allegations in MNAA's counterclaims all, on their face, occurred outside the limitations period. (Wigington Mem. at 6.) Wigington further argues that because the counterclaims are facially time-barred, MNAA is responsible for pleading facts that would excuse the delay under Tennessee law, but fails to do so. (*Id.* at 7; Reply in Supp. of Counter-Def.'s Mot. to Dismiss ("Wigington Reply") (Dkt. No. 47) 2.) MNAA asserts that Wigington mischaracterizes its counterclaims as discrete events and urges that its counterclaims instead allege an ongoing pattern of continuing violations, such that no cause of action would have accrued until Wigington was relieved of his duties as CEO in July 2017. (MNAA Resp. at 13–14.) MNAA also argues that it is entitled to tolling under the statutory discovery rule and that Wigington's statute of limitations arguments require factual development that counsels against dismissal. (*Id.* at 15–19.)

MNAA's counterclaims allege facts that all on their face occur outside of the one-year limitations period. MNAA alleges that, in December 2015, Wigington should have decided how to invest approximately $200 million in bond issue proceeds instead of leaving the decision to a subordinate who chose a cash-equivalent investment that yielded lower returns for MNAA. (Am. Countercl. ¶¶ 12–15, 17–18.) Also in December 2015, and again in December 2016, MNAA alleges Wigington failed to act on a professional financial advisor's tender of financial

services to manage MNAA's bond issue and other cash-equivalent assets. (*Id.* ¶¶ 19–24, 40–43.) Finally, MNAA claims that Wigington decided in the fall of 2016 not to pursue an opportunity to refinance debt incurred from the building of the car rental facility at MNAA. (*Id.* ¶¶ 25–29, 44–45.) None of these allegations occur on or after February 1, 2017, the start of the limitations period in this case. Indeed, the only factual allegation in MNAA's counterclaims that occurs within the limitations period is Wigington's date of termination, October 18, 2017. (*Id.* ¶ 1.) It is thus apparent that no events forming the basis of MNAA's counterclaims took place within the one-year limitations period for breach of fiduciary duty called for by Tennessee Code Annotated § 48-18-601.

MNAA argues that Wigington misconstrues MNAA's counterclaims, which should be read as one continuous violation extending through the end of Wigington's active tenure as CEO in July 2017, thus rendering the counterclaims timely or tolling the statute of limitations. (MNAA Resp. at 13–14.) The "continuing violation" or "ongoing violation" doctrine is most often invoked in discrimination actions under Title VII of the Civil Rights Act of 1964, *Sharpe v. Cureton*, 319 F.3d 259, 267 (6th Cir. 2003), although it has been extended to other areas of the law as well. *Nat'l Parks Conservation Ass'n, Inc. v. Tenn. Valley Auth.*, 480 F.3d 410, 416–17 (6th Cir. 2007) (observing, without deciding, that no principled reason exists to limit continuing violation doctrine to civil rights and employment claims). In the discrimination context, the Sixth Circuit previously recognized two forms of continuing violation: "[1] those alleging serial violations and [2] those identified with a longstanding and demonstrable policy of discrimination." *Sharpe*, 319 F.3d at 266. The subsequent Supreme Court case *National Railroad Passenger Corporation v. Morgan* undermined the first form of this doctrine. 536 U.S. 101, 114, 122 S. Ct. 2061, 2072–73 (2002) (reversing lower court holding that "serial violations" can trigger continuing violations doctrine). "*Morgan* overturns

prior Sixth Circuit law addressing serial violations, *i.e.*, plaintiffs are now precluded from establishing a continuing violation exception by proof that the alleged acts of discrimination occurring prior to the limitations period are sufficiently related to those occurring within the limitations period." *Sharpe*, 319 F.3d at 268.

We have not found a Sixth Circuit case applying the continuing violation doctrine to breach of fiduciary duty, although MNAA argues that this doctrine has been extended to such claims. (MNAA Resp. at 13 (citing *Burkholder v. United Auto. Aerospace and Agric. Implement Workers of Am., Local No. 12*, 700 F. Supp. 2d 895, 907 (N.D. Ohio 2010)).) However, we need not decide whether the doctrine applies to fiduciary duty claims, because we find that MNAA has alleged a series of breaches that would make the doctrine inapplicable in any event. Nowhere in its counterclaims does MNAA allege that Wigington's breaches continued until he was removed from his position as CEO. The allegations instead allege a series of discrete decisions or non-decisions that all occur outside the limitations period. (*See* Am. Countercl. ¶¶ 14–15, 25–29, 40–43.) MNAA itself characterizes Wigington's alleged misconduct as a "series of inactions," a "pattern of inactions," and a "pattern of breach," language that suggests a series of violations instead of one continuing breach. (MNAA Resp. at 13, 14.) A series of breaches does not constitute a continuing violation. *Morgan*, 536 U.S. at 114, 122 S. Ct. at 2072–73; *Sharpe*, 319 F.3d at 268.

Alternatively, MNAA argues that its counterclaims trigger the discovery rule codified in Tennessee's fiduciary duty statute of limitations. Tenn. Code. Ann. § 48-18-601 ("[I]n the event the alleged breach or violation is not discovered nor reasonably should have been discovered within the one-year period, the period of limitation shall be one (1) year from the date such was discovered or reasonably should have been discovered.") (MNAA Resp. at 15–18.) Because Wigington's alleged wrongdoing all occurred outside of the one-year period in MNAA's

18

counterclaims, MNAA must establish why a tolling exception should apply in its pleadings. *Reid*, 499 F. App'x at 526–27.

MNAA claims in its brief that the earliest it could have discovered Wigington's alleged breaches of fiduciary duty was on the first date that he no longer acted as CEO, July 22, 2017. (MNAA Resp. at 17.) Before that date, MNAA argues, only Wigington himself knew of his breaches of duty, and he should not be able to impute knowledge of his own breaches to MNAA as a corporate entity. (*Id.*) MNAA pinpoints one specific allegation to support the argument that MNAA could not have discovered Wigington's misdeeds before his departure:

> Wigington failed or refused to fully disclose these facts to the Board of Commissioners, thereby breaching his duty to fully disclose the information that properly should have been presented to the Board of Commissioners, thereby breaching his fiduciary duties. The losses could and would have been avoided had Wigington complied with his fiduciary duty to disclose relevant information to the Board of Commissioners in a timely manner.

(Am. Countercl. ¶ 46; *see* MNAA Resp. at 17.)

Wigington replies that MNAA "fails to allege *any* facts regarding the discovery of Mr. Wigington's alleged breaches," and therefore does not meet its "'burden to plead affirmatively why the statute of limitations should be tolled.'" (Wigington Reply at 4 (quoting *Reid*, 499 F. App'x at 527).) Wigington contends that MNAA's one allegation possibly supporting application of the discovery rule, (Am. Countercl. ¶ 46), only says that Wigington did not fully disclose information to the Board, but says nothing about when the Board discovered Wigington's alleged breaches. (Wigington Reply at 5.) Moreover, Wigington asserts that MNAA's counterclaims disclose that another agent of MNAA—the Chief Financial Officer ("CFO")—had continuous knowledge of Wigington's allegedly dilatory actions, and whose knowledge could indeed be imputed to MNAA. (*Id.* at 5 n.1.)

Wigington has the better of this argument. MNAA fails to allege facts that support the notion that it did not or could not have discovered Wigington's breaches of duty until after he was relieved as CEO. The one allegation MNAA identifies that suggests the Board did not have full knowledge of Wigington's actions does not say anything about when the Board became aware of actionable facts. (*See* Am. Countercl. ¶ 46.) "Where, as here, defendants have highlighted the apparent untimeliness of the complaint, plaintiffs may not simply rely on the bare assertion that they were unaware of the facts underlying their cause of action." *Bishop v. Lucent Techs., Inc.*, 520 F.3d 516, 520 (6th Cir. 2008). Reading MNAA's counterclaims in the light most favorable to it, as we must, does not require us to give MNAA's silence on when it plausibly knew of Wigington's breaches the benefit of the doubt. *See id.* ("[I]t is not enough for plaintiffs to argue that the complaint, because it is silent as to when they first acquired actual knowledge, must be read in the light most favorable to them . . . .").

MNAA argues that Wigington asks us to impute his knowledge of his own wrongdoing to MNAA, thus establishing that MNAA had knowledge of a cause of action outside the limitations period. (MNAA Resp. at 15–16.) As MNAA points out, a "corporation acts through its agents." (*Id.* at 15 (quoting *Edmonds v. Fehler & Feinauer Const. Co.*, 252 F.2d 639, 641 (6th Cir. 1958).) It is also generally accepted that "a corporate body, as a legal entity, cannot itself have knowledge. If it can be said to have knowledge at all, it must be the imputed knowledge of some corporate agent." 3 Fletcher Cyc. Corp. § 787 (Sept. 2018 update); *see also Bland v. Allstate Ins. Co.*, 944 S.W.2d 372, 376 (Tenn. Ct. App. 1996) ("Of course, the knowledge of an agent is imputed to his principal."). An agent's knowledge is imputed to the principal even if not specifically communicated. *Griffith Motors, Inc. v. Parker*, 633 S.W.2d 319, 322 (Tenn. Ct. App. 1982) (quoting Fletcher's Cyclopedia of Corporations, § 790). And, as MNAA argues, (MNAA Resp. at 15), the knowledge of an agent

who acts in his own interests or adverse to the principal should not be imputed to the principal. *Id.* (citing an exception to the rule of imputed knowledge "where the agent is dealing with the principal in his own interests or where his interests are adverse to that of the principal so that it is to his own advantage not to impart his knowledge to the principal").

But several allegations in MNAA's counterclaims place a non-Wigington MNAA agent in the room with the alleged wrongdoer. MNAA's allegations reveal that its CFO both knew of and advised Wigington of the facts surrounding Wigington's alleged failure to invest cash and cash equivalents at all relevant times. (*See* Wigington Reply at 5 n.1 (citing Am. Countercl.).) The CFO furnished Wigington with quarterly reports that "described how much money MNAA had sitting in cash or cash equivalents." (Am. Countercl. ¶ 20; *see also* MNAA Resp. at 14 ("All the while, Wigington received quarterly reports from MNAA's then Chief Financial Officer describing how much money MNAA had sitting in cash or cash equivalents.").) The CFO "specifically advised" Wigington "that MNAA did not have executives or managers with sufficient knowledge or skill" to invest MNAA's cash-on-hand wisely. (Am. Countercl. ¶ 22.) The CFO informed Wigington in the fall of 2016 of the opportunity to refinance debt on MNAA's rental car facility, and Wigington told the CFO directly to "hold on" with the refinancing, eventually instructing the CFO to cease the effort altogether. (*Id.* ¶¶ 25–26, 28–29.) The counterclaims thus allege on their face that MNAA's CFO knew facts that would give rise to the claim of breach of fiduciary duty for all alleged wrongdoing, all of which occurred outside the limitations period.[6] In addition, MNAA alleges that another of its agents, "an employee subordinate" of Wigington's, necessarily knew of Wigington's alleged failure to select an

---

[6] MNAA's counterclaims also allege that Wigington fired this CFO. (Am. Countercl. ¶ 34.) This does not alter the inference apparent on the face of MNAA's counterclaims that the CFO was an agent of MNAA while employed during the period of Wigington's alleged breaches of fiduciary duty.

investment vehicle for MNAA's $200 million bond issue because the employee was tasked with making the final call as late as January 2016.  (Am. Countercl. ¶¶ 18–19.)

The knowledge of these agents is imputed to the principal even if not specifically communicated to it.  *Griffith Motors, Inc.*, 633 S.W.2d 322.  MNAA's counterclaims thus allege that MNAA had contemporaneous constructive knowledge of Wigington's breaches as they happened.  "[A] plaintiff cannot be permitted to wait until he knows all of the injurious effects or consequences of an actionable wrong to delay the accrual of a cause of action."  *Cavalier Metal Corp. v. Finch & McBroom*, No. W2004-01536-COA-R3CV, 2005 WL 645201, at *4 (Tenn. Ct. App. Mar. 17, 2005) (quoting *Memphis Aero Corp. v. Swain*, 732 S.W.2d 608 (Tenn. Ct. App. 1986)).

MNAA argues that resting our decision on statute of limitations grounds is inappropriate because it requires a factual inquiry.  (MNAA Resp. at 18.)  Although dismissing pleadings as barred by the statute of limitations is generally disfavored, "sometimes the allegations in the complaint affirmatively show that the claim is time-barred.  When that is the case, as it is here, dismissing the claim under Rule 12(b)(6) is appropriate."  *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012).  We have determined that MNAA's counterclaims affirmatively show that each alleged breach of fiduciary duty occurred prior to the applicable limitations period, and fails to establish a tolling exception.

We therefore conclude that MNAA's counterclaims are barred by the one-year statute of limitations set forth in Tennessee Code Annotated § 48-18-601, and we grant Wigington's motion to dismiss.  Because it appears MNAA may not simply re-plead its counterclaims by removing its agents from the picture, we do so with prejudice.

**CONCLUSION**

For the foregoing reasons, Individual Defendants Joslin and Samuels' motion to dismiss Wigington's claims as to them is denied, (Dkt. No. 37), and Wigington's motion to dismiss MNAA's amended counterclaim is granted with prejudice, (Dkt. No. 39).  It is so ordered.

_____
Marvin E. Aspen
United States District Judge

Dated:  March 20, 2019
        Chicago, Illinois